## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **COOK & COMPANY, INC.,** ) | |
| **COOK & COMPANY INSURANCE** ) | |
| **AGENCY, INC.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 09cv10976-NG** |
| ) | |
| **MATRIX RISK MANAGEMENT** ) | |
| **SERVICES, LLC, MATRIX GROUP** ) | |
| **BENEFITS, LLC, COMPANION** ) | |
| **LIFE INSURANCE COMPANY,** ) | |
| **Defendants.** ) | |

**GERTNER, D.J.**

### MEMORANDUM AND ORDER RE:
### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
January 24, 2011

## I.     INTRODUCTION

In Massachusetts and Rhode Island, the municipal governments for Havervill, Dracut,

Malden, Tewksbury, Norfolk, Providence, and Webster ("the Municipalities") separately self-

insure their respective healthcare plans.  In order to protect themselves from catastrophic

financial loss, they have contracted with defendant Companion Life Insurance Company

("Companion") for excess/stop-loss insurance.[1]  Through their stop-loss insurance plans, the

Municipalities submit claims to Companion and, when all goes according to plan, receive

reimbursement if they have paid over a certain amount in health coverage.  Starting in July 2007,

---

[1] Self-insured employers take on the responsibility of insuring the medical expenses of their employees, and possibly also the employees' families.  When a self-insured employer wants to limit liability, though, it may purchase stop-loss insurance.  Under this model, "the [employer] pays for its employees' covered medical care expenses from a trust fund established for that purpose or from current revenues.  At the same time, the [employer] purchases third-party stop-loss insurance for itself -- not for its members -- that covers losses suffered by the plan as the result of members' catastrophic claims against it.  The stop-loss insurance pays the [employer] when the plan's losses in a given year exceed a predetermined amount, known as the 'attachment point.'"  Russell Korobkin, The Battle Over Self-Insured Health Plans, or "One Good Loophole Deserves Another", 5 Yale J. Heath Pol'y L. & Ethics 89, 110-11 (2005).

however, the Municipalities allegedly stopped receiving reimbursement from Companion within "a reasonable time upon receipt of a fully executed Proof of Loss."  Compl. ¶ 27 (document #1-2).

Curiously, the Municipalities are not the plaintiffs here.  The plaintiffs are the Municipalities' insurance consultant and the Municipalities' insurance broker/licenced agent: Cook & Company, Inc. ("Cook Company") and Cook & Company Insurance Agency, Inc. ("Cook Agency"), respectively.  Cook Company is a fee-for-service company that serves as an insurance consultant to the Municipalities, while Cook Agency is an insurance broker/licensed resident agent that helped the Municipalities obtain excess/stop loss insurance from Companion.

In addition to suing Companion, co-plaintiffs Cook Company and Cook Agency are suing Matrix Risk Management Services, Inc. ("Matrix Risk"), and Matrix Group Benefits, Inc. ("Matrix Benefits").  Matrix Benefits is the manger/general underwriter for Companion's Excess/Stop-Loss Insurance ("stop-loss insurance") program, authorized to complete various insurance-related tasks on behalf of Companion.  So empowered, Matrix Benefits contracted with Cook Company for exclusive marketing of Companion's stop-loss insurance in Massachusetts and Rhode Island.  Companion was not a party to this contract between Matrix Benefits and Cook Company.

Matrix Risk is a fee-for-service company that provides health plan consulting services. In this capacity, Matrix Risk entered into various tri-party contracts with both Cook Company and individual municipalities for the administration of a Risk Management Program.  Again, Companion was not a party to these agreements.

Plaintiffs lodge nine different counts against the defendants. First, Cook Company and Cook Agency claim that they have been injured by Companion, Matrix Benefits, and Matrix Risk's unfair and deceptive practice, in violation of Mass. Gen. Laws ch. 93A and ch. 176D (Counts I, II, V, VI, VII, VIII). Second, both plaintiffs are suing Companion for breaching its stop-loss insurance contracts with the individual Municipalities, arguing that Cook Agency was in privity of contract with Companion and that Cook Company was a third-party beneficiary of the stop-loss insurance contracts (Counts III and IV). Third, Cook Agency claims that Matrix Risk violated its tri-party contracts with Cook Agency and the individual Municipalities by improperly administering the Risk Management Program (Count X).[2]

Plaintiffs filed their complaint in Massachusetts Superior Court on April 27, 2009, and defendants subsequently removed the case to federal court. The parties then bifurcated their discovery into two phases, "the first phase focused on the existence of evidence and facts relating to whether the plaintiffs have standing to assert their claims, and whether the Defendants owed any legal or contractual duty to the Plaintiffs." J. Statement 2 (document #12). Following completion of the first discovery phase, both Companion and the Matrix defendants submitted the instant motions for summary judgment on all claims. Per the parties' Joint Statement, these motions relate only to issues of standing and duty. See id. On November 4, 2010, I held a hearing on the motions.

I hold that all defendants are entitled to summary judgment for the following reasons: First, plaintiffs have no standing to sue Companion for breach of the stop-loss insurance contracts with the Municipalities, since Companion owed no contractual duty to either Cook

---

[2] Plaintiffs skipped Count IX.

Company or Cook Agency. Second, there were two contractual relationships between the Matrix defendants and the plaintiffs: 1) the Exclusive Marketing Agreement between Cook Company and Matrix Benefits; and 2) the Risk Management Program contracts between Cook Company, Matrix Risk, and individual municipalities. However, none of these contracts addresses the claim reimbursement allegations at the core of the complaint. Therefore, Cook Company lacks standing to sue Matrix Risk for breaching any of its Risk Management Program contracts. And finally, neither Cook Agency nor Cook Company has standing to bring unfair and deceptive practices claims against any defendant, given the lack of a cognizable injury actionable under Mass. Gen. Laws ch. 93A. Therefore, Matrix Benefits and Matrix Risk's Motion for Summary Judgment (**document #22**) and Companion's Motion for Summary Judgment (**document #25**) are both **GRANTED**.

## II.      FACTS

The five parties in this case form a web of contracts, services, and duties. At the core of this web are the Municipalities, ironically absent from this lawsuit. Given the limitations of the briefing, some of the intricacies of the web remain unclear. Nonetheless, what follows is an attempt to cobble together the facts the parties have offered, taking the facts in the light most favorable to Cook Agency and Cook Company, as I must do at this stage. See Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991) (quoting Fed. R. Civ. P. 56©).

## A.     The Municipalities' Stop-Loss Insurance

The individual Municipalities hired plaintiffs Cook Company and Cook Agency to assist them with their respective self-insurance programs.[3]  Working on behalf of individual municipalities, Cook Agency brokered stop-loss insurance contracts with Companion for the governments, signing these contracts as the licenced registered agent for the Municipalities -- not as a contracting party itself.[4]  By the terms of these stop-loss insurance contracts, Companion was obligated to reimburse each municipality for employee health expenses paid over a certain contractually-determined deductible amount (i.e., $175,000 per person for Haverhill; $225,000 per person for Providence).  Compl. ¶¶ 12-20.  Furthermore, Companion was required "to pay scheduled benefits 'within a reasonable time upon receipt of fully obligated Proof of Loss' . . . [and] documentation reasonably necessary to evaluate the eligibility and extent of the claim."  Id. at ¶¶ 22-23.

Complementing Cook Agency's brokerage work, Cook Company, a fee-for-service provider, completed an assortment of tasks relating to the Municipalities' stop-loss insurance. For instance, Cook Company offered consultations to insurance advisory boards, submitted monthly reports, made cash flow presentations, and filed claims.  Cook Dep. 19:3-15; Compl. ¶ 7.

---

[3] According to Peter Cook, there are "very few ball players in [the] arena" in which Cook Company and Cook Agency specialize.  Cook Dep. 24:6-7, Dec. 22, 2009 (document #32-1).

[4] For instance, the Chairman and President of Cook Company and the President and CEO of Cook Agency, Peter Cook, signed the contract between Companion and the Town of Dracut as the licensed resident agent of a contracting party.  July 9, 2007 Dracut/Companion Contract, O'Connor Aff. Ex. B, at 4 (document #26-2). Similarly, Peter Cook signed the Town of Webster's application to Companion, once again as the licensed resident agent.  July 18, 2006, Webster Application, O'Connor Aff. Ex. C, at 22 (document #26-3).

Although the specifics of the payment arrangements between the Municipalities, Cook Agency, and Cook Company, have not been fully fleshed out, it does seem clear that the Municipalities, not Companion, were solely responsible for paying Cook Company and Cook Agency for tasks relating to the stop-loss insurance Companion offered the Municipalities. Cook Dep. 71:18-72:4. At the same time, since plaintiffs' services did indirectly benefit Companion, the payments that the Municipalities made to Cook Company and Cook Agency for services concerning Companion's stop-loss insurance were somehow "built into the premiums" that a municipality had to pay Companion. Id. at 88:18.

For some time, the stop-loss insurance arrangement between Companion and the Municipalities functioned well enough; the Municipalities submitted their claims and got reimbursed in a timely fashion. Then, starting on July 1, 2007, the Municipalities ceased to get repaid on their claims in a reasonable amount of time. Compl. ¶ 27; see Cook Dep. 53:16-17, 58:22-23, 65:7-8. As described by Peter Cook, the Chairman and President of Cook Company and the President and CEO of Cook Agency, the checks "all of a sudden stopped coming [in]." Cook Dep. 146:5-6. Some municipalities responded by refusing to renew their contracts with Cook Company and electing to forgo Cook Agency's brokerage services in the future. As a result, plaintiffs allege that they suffered damages in the amount of $750,000, an estimate that includes supposed lost revenue from contracts not renewed and new business never won. Compl. ¶ 28; Pls.' Responses to First Set of Interrogatories, O'Connor Aff. Ex. F, at 4 (document #26-4). To recoup this loss, Cook Agency and Cook Company are suing Companion for violating its contractual obligations to the Municipalities, claiming that they are parties to the

stop-loss contracts.[5]  In addition, plaintiffs allege that the ways Companion breached these contracts constitute unfair and deceptive practices in violation of chapters 93A and 176D.

**B.      Matrix Benefits - General Manger's Agreement & Exclusive Marketing Agreement**

Further complicating this web of players, Companion subcontracted with  Matrix Benefits to administer aspects of its stop-loss insurance program.  Specifically, Matrix Benefits was hired to be the fully-authorized general underwriter and manager of Companion's stop-loss insurance program.  Pursuant to their General Manager's Agreement, Matrix Benefits was empowered to collect premiums, adjust and allow claims within a $100,000 deductible limit, and provide certain underwriting services on behalf of Companion.  General Manager's Agreement, Matrix Benefits' Statement of Material Facts Ex. 2 (documents #24-2); Cook Dep. 144:24-145:3.

Matrix Benefits then entered into a separate "Exclusive Marketing Agreement" with Cook Company, whereby Matrix Benefits would offer Companion's stop-loss insurance to municipalities in Massachusetts and Rhode Island exclusively "for the benefit of the municipalities and Cook [Company]."  Cook Aff., Cook Opp'n to Matrix's Mot. Summ. J. Ex. 1, at ¶ 5 (document #31-1); see April 19, 2006 Letter to Peter Cook, O'Connor Aff. Ex. D

---

[5] This dispute between plaintiffs, the Municipalities, and Companion can be analogized to a situation in which a person wants to build a house.  The future homeowner goes to her local hardware store, Cook Company Hardware, and says: "I need some advice on who should build my house.  In exchange for your advice, I'll buy the building materials from you."  Cook Company Hardware replies that the future homeowner should contract with Companion Builders.  Cook Company Hardware also reminds the future homeowner that, under state law, she will need someone to broker the contract with Companion Builders, and recommends his brother, Cook Agency.  Soon thereafter, the contract is signed by the contracting parties: future homeowner and Companion Builders.  In addition, Cook Agency signs as the homeowner's licenced agent.  Eventually, Companion Builders constructs the house with Cook Company Hardware's materials.  A few months later, due to some shoddy construction work, the house begins to crumble.  The homeowner is furious.  She vows never to shop at the hardware store again, or use Cook Agency's brokerage services.  In fact, the homeowner goes around town and tells everyone not to trust Cook Company Hardware.  The hardware store and the broker, who may have indeed made poor business decisions or may have just been unlucky, try to make up their lost future profits by suing Companion Builders, but, as I describe below, they have no standing to do so.  They had no contractual relationship with Companion Builders, only the homeowner.

(document #26-4).  In effect, the Exclusive Marketing Agreement was the only formal contract running between the plaintiff Cook Company and Matrix Benefits.  Significantly, according to plaintiffs, Matrix Benefits honored their Exclusive Marketing Agreement at all times pertinent to this case.  Cook Dep. 131:13-19.

As to the reimbursement delay issue, however, Peter Cook admitted during his deposition that he had no evidence that Matrix Benefits was responsible.  Cook Dep. 147:13-17.  Indeed, he said that, according to the policies governing the Matrix Benefits/Companion relationship, Matrix had no obligation to make a payment of a claim "if Companion didn't fund the reserve account."  Id. at 146:16-20. Nonetheless, plaintiffs sue Matrix Benefits under § 93A for unfair and deceptive practices in connection with Companion's reimbursement delay, an area as to which Matrix Benefits had no contractual relationship with Cook Company or Cook Agency and, in any case, no final authority.

### C.	Matrix Risk - Risk Management Program

The final spinner of this web was Matrix Risk.  Matrix Risk worked collectively with individual municipalities and Cook Company, entering into three-party contracts to implement risk management services.  According to these contracts, the Risk Management Program provided, among other things, funds to contract for independent specialists, directions for the completion of the employer disclosure process, and assistance with identification of specialty hospitals.  See, e.g., Dracut's Application for Services by Matrix Risk and Cook Company, Matrix Benefits' Statement of Material Facts Ex. 4 (document #24-4); Webster Application for Services by Matrix Risk and Cook Company, O'Connor Aff. Ex. C (document #26-3).  At the same time, these contracts explicitly stated that the Risk Management Program would not

"[p]rovide pre-adjudication decisions or advice to administrators related to the Excess Loss contract," "[m]ake medical decisions [or] financial decisions," or "[r]eplace other contracted services or adjudication services or consultants."  Id.

Cook Company claims that Matrix Risk breached the Risk Management Program contracts, of which it was a party, and in so doing, was somehow responsible for the fact that the Municipalities were not properly reimbursed, thereby contributing to an unfair or deceptive practice.  Compl. ¶ 64.  Cook Company, however, offers no details with respect to how Matrix Risk allegedly breached its Risk Management contract, much less any explanation of how implementation of this program would have had any bearing on whether Companion properly and timely reimbursed the Municipalities.

## III.    STANDARD OF REVIEW

A grant of summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Cont'l Cas., 924 F.2d at 373.  The court does not weigh the evidence, but instead determines whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The court must view the record in the light most favorable to the non-moving party, accepting all reasonable inferences favoring that party.  Cont'l Cas., 924 F.2d at 373.

## IV.    DISCUSSION

### A.    Breach of Contract Against Companion (Counts III, IV)

Both Cook Company and Cook Agency are suing Companion for breach of contract, asserting that "[by] refusing and failing to reimburse" the Municipalities, Companion breached its stop-loss contracts.  Compl. ¶¶ 49, 54.  Plaintiffs further allege in their complaint that, along

with the Municipalities, they have the right to sue since they were "either in privity of contract and/or . . . a third-party beneficiary to those contracts." <u>Id.</u> at ¶ 49.  In their briefing, they explain that Cook Agency alleges privity of contact with Companion, while Cook Company sues Companion as a third-party beneficiary.  I disagree.  On either theory Cook Company and Cook Agency have no right to sue for breach of contract.

### 1.  Privity of Contract - Cook Agency

Offering facts but no law in its briefing, Cook Agency claims that it was in "privity of contract" with Companion, though its invocation of this legal doctrine is difficult to decipher. Privity is a connection or relationship between parties having a legally recognized interest in the same subject matter.  Black's Law Dictionary 1237 (9th ed. 2009).  Cook Company is presumably arguing that it was a party to the stop-loss contracts, along with the individual municipalities and Companion.  Nothing supports this contention.

A contract does not exist unless there is a manifestation of mutual assent, requiring that each party make a promise or begin to render a performance.  Restatement (Second) of Contracts § 18 (1981); <u>see generally</u> <u>J.C. Higgins Corp. v. Fitchburg Energy Corp.</u>, No. 927854C, 1994 WL 879794, at *4 (Mass. Super. Aug. 31, 1994) (adopting § 18 of the Restatement (Second) of Contracts).  A manifestation of assent, however, is not effective unless the party intends to engage in the conduct that is interpreted as manifesting assent and knows or has reason to know that the party may infer from his conduct that he assents.  <u>Id.</u> at § 19(2).  To be sure, a party may manifest assent even when he does not in fact assent.  <u>Id.</u> at § 19(3).  With these basic principles in mind, I consider Cook Agency's allegation that it was a party to the stop-loss contracts.

No written contract between Cook Agency and Companion exists. Cook Agency presumably contracted with the Municipalities, who in turn contracted with Companion. But on this record, it is clear that Cook Agency and Companion never signed any formal document as two contracting parties.

The sole basis for Cook Agency's claim is that it brokered the stop-loss insurance contracts, but that alone does not establish privity. There is no evidence that Companion manifested assent to contracting with Cook Company. Indeed, as Cook Agency itself highlighted in its briefing, nothing in the documents suggests that Cook Agency had any legal interest in the contracts other than the fact that Peter Cook signed them as the licensed registered agent of the contracting municipality. Cook Dep. 41:4-9.[6] Peter Cook said as much during his deposition, offering only descriptions of his company's obligations *to the Municipalities*. For instance, he testified:

> Cook, as the broker, has responsibilities to the client, the municipality, when claims aren't being paid in an appropriate basis or timing.

Cook Dep. 76:20-23.

> As a broker, the broker expects an insurance company to pay claims in a timely fashion. . . . The relationship that we have with

---

[6] Peter Cook testified as follows:

> Q:    Is there any other feature of this contract or this policy or the application that you say makes Cook a party to the contract?
> A:    No, just the, just my signature as the agent binding the contract.
> Q:    Do I understand you correctly that your belief is that because you've affixed your signature on here as witness to the signature of the Town Manager that, therefore, either you personally or one of the other of the Cook entities are parties to the insurance contract that subsequently was issued?
> A:    Oh, absolutely.

Cook Dep. 41:4-17.

the municipals' accounts hold Cook responsible when claims are not paid in a timely fashion.

Id. at 77:5-10.

If Cook is making the recommendation, as a consultant, after taking work in an RFP and analyzing all the insurance companies that would quote on it and they recommend to their client, to the municipality that they buy the reinsurance . . . then [Companion has] a duty to Cook, also, to pay the claims in a timely fashion.

Id. at 78:13-21.

Ironically, by citing these facts to buttress its claim, Cook Agency razes it to the ground.

The fact that Cook Agency brokered a contract and signed the agreement suggests only that Companion and the Municipalities abided by the laws of Massachusetts. See, e.g., Mass. Gen. Laws ch. 175, § 162 ("All binders of insurance and insurance policies shall be signed by a licensed individual or by such person acting under a power of attorney."). Companion never paid Cook Agency for its services; presumably, the Municipalities did.

The only contractual obligation that Cook Agency had was to its "client[s]" the Municipalities. Cook Dep. 64:7.[7] The Municipalities may arguably hold Cook Agency responsible for inducing it to enter into a contract with a company that ultimately breached the agreement, but Cook Agency cannot in turn deflect its responsibility onto Companion when Companion owed Cook Agency no contractual duty. Therefore, Cook Agency's Motion for Summary Judgment on Count IV is **GRANTED**.

---

[7] Upon learning that Companion was late paying the Municipalities, Peter Cook wrote to Companion saying, "[I]f I need to protect my client, I will be forced to notify the Attorney General." Cook Dep. 64:7-9.

## 2.    Third Party Beneficiary - Cook Company

Cook Company argues that it was an intended third party beneficiary to the stop-loss contracts between the Municipalities and Companion.  The Restatement of Contracts generally explains that "unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  Restatement (Second) of Contracts § 302 (1981); see also Rae v. Air Speed, Inc., 386 Mass. 187, 195 (1982) (adopting § 302 of the Restatement) ("When one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach of such engagement.").

In Massachusetts, the intent requirement articulated in prong (b) of the Restatement is vital.  The Supreme Judicial Court ("SJC") has indicated that a plaintiff must clearly demonstrate that she was an intended beneficiary of the contract in order to recover as a third-party beneficiary.  Spinner v. Nutt, 417 Mass. 549, 555 (1994).  Simply deriving a benefit from a contract is insufficient to prove that one is an intended third-party beneficiary.  Id.  at 555-56.  Rather, a contract does "not confer third-party beneficiary status '[u]nless the language and circumstances of the contract' show that the parties to the contract 'clear[ly] and definite[ly]' intended the beneficiary to benefit from the promised performance."  Cumis Ins.  Soc'y, Inc. v.

BJ's Wholesale Club, Inc., 455 Mass. 458, 466 (2009) (quoting Anderson v. Fox Hill Vill. Homeowners Corp., 424 Mass. 365, 366-67 (1997)).

In this case, plaintiffs have offered no evidence that either the Municipalities or Companion intended to give Cook Company the benefit of the stop-loss contracts, much less specific assurance of prompt payment of claims. All that plaintiffs offer by way of proof are the following three allegations: First, as consultant to the Municipalities, Cook Company supposedly "was in prime position to introduce Companion," as a reinsurer to the Municipalities. Pls.' Mem. Law Opp'n to Def. Companion's Mot. Summ. J. 10 (document #30). Second, according to Cook Company, as the manager and underwriter of Companions' stop-loss insurance program, Matrix Benefits assumed all the same liabilities as did Companion for anything concerning the stop-loss insurance program. And finally, Matrix Benefits' agreement with Cook and Company, namely the Exclusive *Marketing* Agreement between Matrix Benefits and Cook Company, somehow created in Matrix Benefits a duty to ensure that *Companion* properly responded to the Municipalities' claims.

These allegations are, however, misplaced. First, Cook Company offers no direct evidence of *Companion's* intent to make Cook Company a third-party beneficiary of its stop-loss contracts. The stop-loss contracts, which are the subject of this law suit, evince no such intent. The Exclusive Marketing Agreement between Matrix Benefits and Cook Company does not change that conclusion. Companion was not a party to the Exclusive Marketing agreement. The subject of the Exclusive Marketing agreement has nothing to do with the subject of this lawsuit, namely a lawsuit addressing the prompt payment of claims. Indeed, nothing in the language of the agreement creates a duty in Matrix Benefits, much less Companion, to ensure that

Companion do anything in relation to the prompt payment of claims, and surely not a duty running to Cook and Company.

To the extent that Companion was bound in any way by the Cook Company/Matrix Benefits Exclusive Marketing agreement, it was that Companion "would not market to any other entity in Massachusetts."  Hutchingson Dep 20:14-16, April 22, 2010 (document #32-5).  And to the extent that Companion was bound by the General Manager's Agreement it had with Matrix Benefits, that agreement did not make Cook Company a third party beneficiary.  While the General Manager's Agreement authorized Matrix Benefits to do certain things on behalf of Companion in connection with the stop-loss program -- e.g., collect premiums, adjust certain claims within a $100,000 deductible, and provide underwriting services -- nothing in the agreement authorizes Matrix Benefit to extend Companion's contractual duty to the Municipalities to third parties, like Cook Company.

Second, Cook Company highlights no facts allowing an inference that Companion intended to benefit Cook Company in any way.  As I explained above, the fact that Cook Company benefitted from the functioning of the stop-loss insurance contracts between the Municipalities and Companion does not make it an intended third party beneficiary.  See Spinner, 417 Mass. at 555.  For example, subcontractors of a general contractor may benefit from the prime contract, but that does not make them third party beneficiaries.  They are at best incidental, not intended beneficiaries bound by contract.

Therefore, Cook Company's Motion for Summary Judgment on Count III is **GRANTED**.

**B.      Breach of Contract Against Matrix Risk (Counts X)**

Cook Company sues Matrix Risk for breaching the tri-party Risk Management Program contracts between individual municipalities, Cook Company, and Matrix Risk, alleging that Matrix Risk failed to "properly" administer the program.  Compl.  ¶ 89.  While Cook Company did have a contractual relationship with Matrix Risk by dint of these agreements, the allegations in the complaint have nothing to do with that relationship.

Despite plaintiff's protestations to the contrary, proof that the Municipalities were not reimbursed properly is not evidence of Matrix Risk's breach of the Risk Management Program contracts.  While plaintiffs have provided the Court with copies of both Dracut's Application for Services by Matrix Risk and Cook Company (document # 24-4) and Webster's Application for Services by Matrix Risk and Cook Company (document #26-3), in neither contract is there any language that would obligate Matrix Risk to ensure that Companion (or Matrix Benefits as the general underwriter) properly reimburses the Municipalities.  In fact, the agreements explicitly say that the Risk Management Program does not provide "pre-adjudication decisions or advice to administrators related to the Excess Loss[/stop-loss] contract."  Dracut's Application for Services by Matrix Risk and Cook Company; Webster's Application for Services by Matrix Risk and Cook Company.

Since the only injury that plaintiffs articulate concerns the payment of the Municipalities' claims, and the Risk Management Program contracts did not obligate Matrix Risk to ensure timely reimbursement, Cook Company lacks standing to sue Matrix Risk for breaching these contracts.  Therefore, Matrix Risk's Motion for Summary Judgment on Count X is **GRANTED**.

## C. Unfair and Deceptive Practices Claims (Counts I, II, V, VI, VII, VIII)

Both Cook Company and Cook Agency sue Companion, Matrix Benefits, and Matrix Risk under Mass. Gen. Laws ch. 93A and ch. 176D.  Section 2 of Chapter 93A of the Massachusetts General Laws makes it unlawful to engage in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Offering additional specificity for the insurance industry, Clause 9 of Section 3 of Chapter 176D of the Massachusetts General Laws explains that unfair claim settlement practices may consists of, amongst other things: (1) "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies," Mass. Gen. Laws. ch. 176D, § 3(9)(b); (2) "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information," id. at § 3(9)(d); and (3) "[d]elaying the . . . payment of claims by requiring that an insured or claimant . . . submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information," id. at § 3(9)(l).

All three defendants move for summary judgment on all claims of unfair and deceptive practice, arguing that Cook Company and Cook Agency do not have standing.  Given that plaintiffs have offered no cognizable injury actionable under Chapters 93A and176D, both Companion's Motion for Summary Judgment on Counts I and II and Matrix Benefit and Matrix Risk's Motion for Summary Judgment on Counts V, VI, VII, and X are **GRANTED.**

1.      **Cause of Action**

First, plaintiffs neglect to articulate the authorization for their cause of action.  Although evoking both chapter 93A and chapter 176D, plaintiffs cannot sue under chapter 176D, since the statute offers no private cause of action.  See Thorpe v. Mutual of Omaha Ins. Co., 984 F.2d 541, 544 n.1 (1st Cir. 1993) (citing Dodd v. Commercial Union Ins. Co, 373 Mass. 72, 77 (1977)); United States. ex rel. Metric Elec., Inc. v. Enviroserve, Inc., 301 F. Supp. 2d 56, 70 (D. Mass. 2003) (citing M. DeMatteo Constr. Co. v. Century Indemn. Co., 182 F. Supp. 2d 146, 159-60 (D. Mass. 2001).[8]  Therefore, plaintiffs' right to sue must stem from chapter 93A, which designs two mutually exclusive private rights of action.  First, section 9 broadly says:

> Any person, *other than a person entitled to bring action under section eleven of this chapter*, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person *whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D* may bring an action.

Mass. Gen. Laws ch. 93A, § 9(1) (emphasis added).  In addition, section 11 explains:

> *Any person who engages in the conduct of any trade or commerce* and who suffers any loss of money or property, real or personal, as a result of the use or employment *by another person who engages in any trade or commerce* of an unfair method of competition or an unfair or deceptive act or practice *declared unlawful by section two or by any rule or regulation issued under paragraph © of section two* may, as hereinafter provided, bring an action.

Id. § 11 (emphasis added).  The plain language of the statute makes clear that Cook Company and Cook Agency have no standing under Section 9 unless they are unable to sue under Section

---

[8] Sections 6 and 7 of chapter 176D give the Massachusetts Commissioner of Insurance the exclusive authority to enforce the provisions of that chapter against insurers who engage in prohibited conduct.  Thorpe, 984 F.2d at 544; U.S. ex rel. Metric, 301 F. Supp. 2d at 69-70 (citing M. DeMatteo, 182 F. Supp. 2d at 60).

-18-

11.  This distinction between these two sections is critical, since unfair actions under Section 3(9) of Chapter 176D lay a foundation for actions under section 9 of chapter 93A but not under section 11 of chapter 93A.  Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000) (citing Emp'rs Ins. of Wausau v. George, 41 Mass. App. Ct. 716, 729 (1996); DiVenuti v. Reardon, 37 Mass. App. Ct. 73, 79 (1994)); Jet Line Servs., Inc. v. Am. Emp'rs Ins. Co., 404 Mass. 706, 717 n.11 (1989).

The choice between the two causes of action turns on whether the parties "engage[] in the conduct of any trade or commerce."  While Chapter 93A fails to specifically define the phrase, see Lantner v. Carson, 374 Mass. 606, 610 (1978), it does explain that "trade or commerce" includes:

> advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

Mass. Gen. Laws ch. 93A, § 1(b).  Furthermore, the SJC has interpreted the statute as establishing a "sharp distinction between a business person and an individual who participates in commercial transactions on a private, nonprofessional basis," holding that the term "engaged in the conduct of any trade or commerce," refers "specifically" to people acting in the business context.  Lantner, 374 Mass. at 610, 611.  In other words, for a plaintiff to fall within the ambit of section 11 of chapter 93A, "[a]ll that is required . . . is some transaction in business context."  M. DeMatteo, 182 F. Supp. 2d at 160 n.9 (citing Int'l Fid. Ins. Co. v. Wilson, 387 Mass. 841, 852 (1983)).

Cook Company, Cook Agency, Companion, Matrix Benefits, and Matrix Risk are obviously businesses in the insurance industry, and the actions at issue in this case all occurred in the context of their insurance-related transactions.[9]  Therefore, plaintiffs' claims of unfair and deceptive practices are properly characterized as section 11 actions under chapter 93A.

### 2. No Cognizable Injury

With the cause of action in mind, the question becomes whether plaintiffs have articulated an injury actionable under Section 11.  A plethora of practices fall until the ambit of Chapter 93A violations, though the actual statute does not articulate them.  Instead, it says that courts should be guided by the interpretations and regulations promulgated by the Federal Trade Commission.  Mass. Gen. Laws ch. 93A, § 2(b).  Similarly, the statute authorizes the Massachusetts Attorney General to make rules and regulations interpreting the provisions of the chapter.  Id. at § 2©.  However, a party suing under Section 11 cannot rely upon insurance-related prohibitions articulated by Section 3(9) of Chapter 176D.  Cont'l Ins., 216 F.3d at 156; Jet Line Servs., 404 Mass. at 717 n.11; DiVenuti, 37 Mass. App. Ct. at 79.

In this case, the only allegations that Cook Company and Cook Agency have articulated are those based on chapter 176D prohibitions.  In their complaint, they describe their injuries as follows:  First, they generally allege that by "failing and refusing to reimburse" the Municipalities, the defendants all committed acts that constitute unfair and deceptive practices.  Comp. ¶¶ 34, 43, 62, 69, 77, 84.  With regard to Companion, plaintiffs additionally claim that

---

[9] Cook Company is a fee-for-service company that provides services in the areas of health plan management and consulting, electronic monitoring and auditing, and third-party administration services, Compl. ¶ 7; Cook Agency is a licensed insurance agency, id. at ¶ 8; Companion is a corporation that provides reinsurance coverage, id. at ¶¶ 5, 12; Matrix Benefits is a corporation that functions as an authorized general underwriter for Companion, id. at ¶¶ 4, 25; and Matrix Risk is a corporation that worked to ensure "proper" administration of the Municipalities' claims, id. at ¶¶ 3, 24.

Companion acted in bad faith when refusing to reimburse the Municipalities, id. at ¶¶ 36, 46; neglecting to pay claims in a timely manner, id. at ¶ 45; and ignoring demands for timely payments, id. With respect to Matrix Risk, plaintiffs allege that the defendant refused to adequately and properly administer the Risk Management Program. Id. at ¶¶ 64, 71. Finally, plaintiffs assert that Matrix Benefits failed to adequately and properly provide underwriting services. Id. at ¶¶ 79, 86. And in their supplemental briefing, plaintiffs neglect to give any more shape to these claimed injuries.

To the extent that these allegations involve insurance obligations under chapter 176D, the plaintiffs have not articulated a cognizable injury under chapter 93A. To the extent that these allegations involve regulations promulgated by the Federal Trade Commission or rules and regulations established by the state Attorney General, plaintiffs have not said so. As a result, plaintiffs lack standing to bring their unfair and deceptive practice claims.[10]

---

[10] A chapter 93A claimant must show that the defendant's "actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury . . . to competitors or other business [persons].'" Boyle v. Int'l Truck & Engine Corp, 369 F.3d 9, 15 (1st Cir. 2004) (quoting Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir.1989); PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)). Put another way, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." Saint-Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001) (citing Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996) (quoting Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979))). Refusal to pay for goods or services because one disputes the amount of the bill, for example, does not give rise to a chapter 93A action. Levings, 8 Mass. App. Ct. at 504.

To date, Cook Company and Cook Agency have provided no proof that any defendant's actions rose to the level of rascality. Rather, they have offered only the vague allegation in their complaint that defendants "unfairly, intentionally and deceptively failed to fulfill their respective responsibilities to pay the scheduled benefits within a reasonable time upon receipt of a fully executed Proof of Loss thereby resulting in the unpaid excess losses to the governmental units." Compl. ¶ 27. However, defendants are not liable under chapter 93A simply for failing to timely pay a claim that it reasonably believed was not warranted. Levings, 8 Mass. App. Ct. at 504.

Given that the instant motions for summary judgment come on the heels of discovery limited to the issues of standing and duty only, I cannot and am not ruling on the basis of this dearth of evidence. Although, I am skeptical that, if this case were to proceed forward, plaintiffs could produce evidence sufficient to prove that defendants' actions were unscrupulous by the standards of the rough and tumble world of insurance.

## V.    CONCLUSION

For the foregoing reasons, Matrix Benefits and Matrix Risk's Motion for Summary Judgment (**document #22**) is **GRANTED**.  Likewise, Companion's Motion for Summary Judgment (**document #25**) is **GRANTED**.


**SO ORDERED.**

**Date:  January 24, 2011**          _/s/ Nancy Gertner_
                                      **NANCY GERTNER, U.S.D.J.**